1
2
3
4
5
6          IN THE UNITED STATES DISTRICT COURT
7        FOR THE NORTHERN DISTRICT OF CALIFORNIA
8
STEVEN RICE,                    )   No. C 09-1496 LHK (PR)
9                               )
          Plaintiff,            )   ORDER GRANTING DEFENDANTS'
10                              )   MOTION TO DISMISS AND MOTION
    vs.                         )   FOR SUMMARY JUDGMENT
11                              )
OFFICER J. RAMSEY, et al.,      )
12                              )   (Docket No. 20)
          Defendants.          )
13                              )
   ─────────────────────────── )
14

Plaintiff Steven Rice, proceeding *pro se*, filed a civil rights complaint pursuant to 42

U.S.C. § 1983 against prison officials at the Correctional Training Facility ("CTF").  Plaintiff

alleged violations of his First Amendment free exercise rights, his Fourteenth Amendment equal

protection rights, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

(Compl. at 11-12, 13.)  Subsequently, Plaintiff filed a motion to amend his complaint as well as a

proposed amended complaint.  The Court reviewed both complaints and determined that

"substantively, the claims [we]re the same." (Aug. 30, 2012 Order at 2.)  Therefore, the Court

granted Plaintiff's motion to amend the complaint, and his amended complaint was deemed the

operative complaint in this action.  (*Id.*)

Plaintiff, an avowed member of the Muslim Ansar El Mohammad ("AEM") faith, alleged

that Defendants violated the civil rights of all AEM Muslims by refusing: (1) to provide a

religious morning breakfast or Suhoor[1] meal during the Holy Month of Ramadan; (2) to give

───────────────────

[1] Suhoor meals are eaten by Muslims before sunrise during the month of Ramadan.

Order Granting Defendants' Motion to Dismiss and Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.09\Rice496msj.wpd

them access to the interfaith chapel to conduct classes according to the AEM; and (3) to hire a full or part time AEM representative or "imam."[2] (Am. Compl. at 10.)  Plaintiff seeks monetary damages and injunctive relief.

Plaintiff named the following Defendants: Warden B. Curry, Associate Warden W. J. Hill; Correctional Business Manager P. J. Mullen; Facility Captain L. Warren; Facility Captain K. J. Allen; Chief Deputy Warden C. Noll; and former Chief of Inmate Appeals N. Grannis.[3]

Defendants Warren and Allen were issued summonses on October 20, 2009, but no confirmation of service has been received.  (Docket No. 6.)  Therefore, to date, Defendants Warren and Allen have not been served in this action.

The remaining Defendants move for dismissal for failure to exhaust administrative remedies as to Plaintiff's First Amendment claim relating to the denial of Suhoor meals.  These Defendants have also moved for summary judgment on the remaining claims, arguing that there is no disputed issue of material fact, that they are entitled to judgment as a matter of law, and that they are entitled to qualified immunity.  Plaintiff has filed an opposition to the motion, and Defendants have filed a reply.

The Court notes that in his opposition, Plaintiff admits that he did not properly exhaust his First Amendment claim relating to the denial of Suhoor meals.  (Opp'n at 17.)

Since the time Defendants' present dispositive motion has been submitted, a recent decision from the Ninth Circuit Court of Appeals was issued that now requires *pro se* prisoner-

---

[2] In his amended complaint, the Court notes that Plaintiff also claims that Defendants denied him the special meal for Eid, a Muslim holiday that marks the end of the fasting period of Ramadan. (Am. Compl. at 10.)  However, neither party mentions this claim in their briefs.  In any event, there is no evidence in the record that Plaintiff has exhausted all available administrative remedies as to this claim.  Therefore, based on the foregoing, the Court will not address it in this Order.

[3] In the original complaint, Plaintiff included Defendants Curry, Hill, Mullen, Warren, Allen, Noll, and Grannis in his list of named Defendants, while the amended complaint omits both Defendants Noll and Grannis.  However, in the amended complaint, Plaintiff included Defendants Noll and Grannis in his request for relief to pay $70,000 in damages.  Thus, in its August 30, 2010 Order, the Court liberally construed his amended complaint and assumed that Plaintiff intended to include Defendants Grannis and Noll in this action.

1  plaintiffs to be given "notice of what is required of them in order to oppose" summary judgment

2  motions at the time of filing of the motions. *Woods v. Carey*, 684 F.3d 934, 935, 940-41 (9th

3  Cir. 2012).  In an Order dated August 9, 2012, the Court, pursuant to *Woods* and in accordance

4  with the holding of *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998), explained to

5  Plaintiff what he must do in order to oppose a motion for summary judgment. (Aug. 9, 2012

6  Order at 1-2 (citing *Woods*, 684 F.3d at 935, 940-41).)  The Court then set a new briefing

7  schedule, which directed Plaintiff to file a supplemental opposition no later than August 31,

8  2012, and Defendants to file a supplemental reply no later than September 7, 2012.

9       On August 31, 2012, Plaintiff filed his supplemental opposition.  In his one-page

10  supplemental opposition, Plaintiff again concedes that he failed to exhaust administrative

11  remedies "on one issue of Sahoor meals for fasting in the month of December." (Supp. Opp'n at

12  1.)  Plaintiff also "seeks to affirm all other issues in his Opposition to Defendants' Summary

13  Judgment [Motion] . . . ." (*Id.*)  Thereafter, Defendants filed their supplemental reply.

14       Having carefully considered the papers submitted, the Court hereby GRANTS

15  Defendants' motion to dismiss Plaintiff's First Amendment claim relating to the denial of Suhoor

16  meals because he concedes to the non-exhaustion of this claim, and GRANTS Defendants'

17  motion for summary judgment on all the remaining claims as to the served Defendants as well as

18  unserved Defendants Warren and Allen, for the reasons set out below.

19                    **FACTUAL BACKGROUND**

20       The following facts are undisputed unless otherwise indicated.

21       As mentioned above, Plaintiff is an avowed AEM Muslim.  He claims that he has been

22  practicing for "more than fifteen (15) years." (Rice Decl. ¶ 2.)

23  I.    Denial of Suhoor Meals

24       Plaintiff has conceded that he did not exhaust his administrative remedies as to his claim

25  relating to the denial of Suhoor meals.  Therefore, because the Court will grant Defendants'

26  motion to dismiss this claim as unexhausted, it need not include a factual background as to this

27  claim.

28

1   II.     Denial of Separate Access to Interfaith Chapel

2           On October 8, 2007, Plaintiff submitted a 602 inmate appeal on behalf of himself and

3   other inmates requesting "permission to have access to the interfaith chapel to conduct classes in

4   relation[] to the [AEM] teachings for a few hours a week i.e., Wednesday's; Thursday's; or

5   Friday's." (Am. Compl. at 7; Ex. A.)  Plaintiff stated in his 602 appeal that AEM Muslims "are

6   being discriminated against and this has been going on for years . . . due to the fact of being

7   denied time/access in the chapel."  (Am. Compl., Ex. A.)

8           On November 26, 2007, the appeal was partially granted at the first formal level of

9   review by Defendant Mullen.  (Am. Compl., Ex. A-1 at 1.)  Defendant Mullen noted that on

10  November 20, 2007, Muslim Chaplain Imam Tariq Ansaar Aquil met with Plaintiff to discuss the

11  group appeal.  (*Id.*)  In partially granting the appeal, Defendant Mullen stated:

12          The Muslim Chaplain provides a comprehensive religious program in the chapel
            that addresses the essentials for those who profess Islam as their religion (see
13          attachment).

14          Inmate Rice and the other inmates in the Muslim community are able to avail
            themselves of the existing religious resources offered in the chapel without
15          duplication of augmenting the present Islamic religious program.

16  (*Id.*)  Attached to the partial grant is a document entitled, "Essentials for those who profess Islam

17  as their religion."  (*Id.* at 2.)  The document contains the "Articles of Faith," the "Five Pillars of

18  Islam," and a schedule of "Observances Required of all Muslims."  (*Id.*)  The observances

19  include the following: (1) daily - five prayers; (2) weekly - Jumah Prayer (Friday); and

20  (3) annually - Ramadan Fast, Eid ul Fitr (At the conclusion of Ramadan), and Eid ul Adha

21  (Observance of Prophet Abraham's Sacrifice at conclusion of the Hajj).  (*Id.*)

22          On December 9, 2007, Plaintiff appealed the partial grant at the first level of review

23  stating that he was "not in opposition with regard to Imam Tariq Ansaar Aquil's religious

24  program . . . .  However, this is not the crux of [the] appeal, which is not in dispute of the present

25  Islamic program, but to simply establish a few hours weekly in the chapel to freely practice [his]

26  way of life; accordingly, to the [AEM] train of thought."  (Am. Compl. at 7, A-2 at 2.)

27          On January 11, 2008, and January 14, 2008, Defendants Hill and Curry, respectively,

28

1  denied Plaintiff's appeal at the second level of review, stating that the AEM Muslims were

2  "afforded an opportunity to freely participate in the Islamic religious program at CTF Soledad."

3  (Am. Compl., Ex. A-3 at 2.)  They added: "All of those inmates at CTF Soledad professing Islam

4  as their faith are now and continue to be afforded full access to all necessary accommodation

5  required in the Qur'an to fulfill the core religious obligations within an institutional setting." (*Id.*)

6          On January 28, 2008, Plaintiff, who was dissatisfied with the response at the second level

7  of review, appealed to the third and final level of review.  (Am. Compl., Ex. A-4.)

8          On April 26, 2008, Defendant Grannis partially granted the appeal at the third level of

9  review stating that CTF shall: "present appellant's request for separate service time in the chapel

10  for the [AEM] faith to its Religious Review Committee (RRC) pursuant to CCR 3210.  Such

11  review process does not imply any particular outcome, but ensures that the full RRC has

12  reviewed the appellant's request."  (Am. Compl., Ex. A-5.)

13          On May 14, 2008, Plaintiff wrote a letter to Defendant Curry, Defendant Noll, and the

14  RRC inquiring about whether his request for separate access to the interfaith chapel for AEM

15  Muslims had been referred to the RRC.  (Am. Compl., Ex. A-6.)  As of March 12, 2012, the date

16  Plaintiff signed his amended complaint, he claims that he was "still await[ing] an answer [to] this

17  letter."  (Am. Compl. at 8.)

18  III.    Denial of AEM Imam

19          On October 15, 2007, Plaintiff submitted another 602 inmate appeal relating to hiring a

20  part time or a full time AEM imam.  (Am. Compl., Ex. B, B-1.)

21          On November 26, 2007, Defendant Mullen partially granted the appeal at the first level of

22  review, stating that CTF had "hired a Muslim Chaplain [on November 5, 2007] whose

23  responsibilities, among others, are to address the spiritual and religious educational needs of the

24  inmates at CTF." (*Id.*, Ex. B-3 (brackets added).)  Defendant Mullen added: "The Muslim

25  community is able to benefit through the existing religious resources." (*Id.*)

26          On December 9, 2007, Plaintiff appealed to the second level of review because he was

27  dissatisfied with the partial grant at the first level of review.  (Am. Compl., Ex. B-4.)

28          On January 25, 2008, Defendants Hill and Curry denied Plaintiff's appeal at the second

level of review stating that CTF had hired a Muslim Chaplain and AEM Muslims were "welcome to avail [them]selves of the Islamic religious services." (Am. Compl., Ex. B-5 at 2.) They added that the California Department of Corrections and Rehabilitations ("CDCR") is "not budgeted to hire additional chaplains." (*Id.*)

On February 5, 2008, Plaintiff again appealed to the third level of review upon finding the response at the second level of review to be "inadequate and unsatisfactory." (Am. Compl., Ex. B-7.)

On May 12, 2008, Defendant Grannis denied the appeal at the third level of review stating: "After a review of the appeal, the appellant has failed to provide any evidence or substantive information that he has been denied access to religious services." (Am. Compl., Ex. B-8.) Defendant Grannis added that there is "an undue financial burden on the State to provide funding for religious services and a representative of a given faith for every sect and at each institution throughout the CDCR." (*Id.*) Accordingly, she concluded that "[r]elief in this matter is not warranted at the [Third] Level of Review." (*Id.*)

## MOTION TO DISMISS

As explained above, Defendants move for the dismissal for failure to exhaust administrative remedies as to Plaintiff's First Amendment claim relating to the denial of Suhoor meals.

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Although once within the discretion of the district court, exhaustion in prisoner cases covered by § 1997e(a) is now mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002). All available remedies must now be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Id.* (citation omitted). Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.

1   *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001).  Similarly, exhaustion is a prerequisite to all

2   prisoner suits about prison life, whether they involve general circumstances or particular

3   episodes, and whether they allege excessive force or some other wrong.  *Porter*, 534 U.S. at 532.

4   PLRA's exhaustion requirement requires "proper exhaustion" of available administrative

5   remedies.  *Woodford v. Ngo*, 548 U.S. 81, 94 (2006).

6          The State of California provides its prisoners the right to appeal administratively "any

7   departmental decision, action, condition or policy perceived by those individuals as adversely

8   affecting their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also provides them the right to

9   file appeals alleging misconduct by correctional officers/officials.  *Id.* § 3084.1(e).  In order to

10  exhaust available administrative remedies within this system, a prisoner must proceed through

11  several levels of appeal: (1) informal resolution; (2) formal written appeal on a CDC 602 inmate

12  appeal form; (3) second level appeal to the institution head or designee; and (4) third level appeal

13  to the Director of the California Department of Corrections and Rehabilitation.  *Barry v. Ratelle*,

14  985 F. Supp. 1235, 1237 (S.D. Cal. 1997) (citing Cal. Code Regs. tit. 15, § 3084.5).  A final

15  decision from the Director's level of review satisfies the exhaustion requirement under

16  § 1997e(a).  *Id.* at 1237-38.

17         Non-exhaustion under § 1997e(a) is an affirmative defense which should be brought by

18  defendants in an unenumerated motion to dismiss under Federal Rule of Civil Procedure 12(b).

19  *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).  However, a complaint, or in this case --

20  a claim -- may be dismissed by the court for failure to exhaust if a prisoner "conce[des] to

21  nonexhaustion" and "no exception to exhaustion applies."  *Id.* at 1120.  Here, Plaintiff concedes

22  he has not exhausted his administrative remedies as to his First Amendment claim relating to the

23  denial of Suhoor meals.  (Opp'n at 17.)  Plaintiff has not presented any extraordinary

24  circumstances which might compel that he be excused from complying with PLRA's exhaustion

25  requirement.  *Cf. Booth*, 532 U.S. at 741 n.6 (courts should not read "futility or other exceptions"

26  into § 1997e(a)).

27         Accordingly, Defendants' motion to dismiss is GRANTED, and Plaintiff's First

28

1     Amendment claim relating to the denial of Suhoor meals is DISMISSED without prejudice to

2     refiling this claim in a new action after exhausting California's prison administrative process.

3     *See McKinney v. Carey*, 311 F.3d 1198, 1199-1201 (9th Cir. 2002) (action must be dismissed

4     without prejudice unless prisoner exhausted available administrative remedies before he filed

5     suit, even if prisoner fully exhausts while the suit is pending).

6                            **MOTION FOR SUMMARY JUDGMENT**

7     I.     <u>Legal Standard</u>

8            Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

9     that there is "no genuine issue as to any material fact and that the moving party is entitled to

10     judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect

11     the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute

12     as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

13     verdict for the nonmoving party. *Id.*

14            The party moving for summary judgment bears the initial burden of identifying those

15     portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

16     issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Where the moving

17     party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

18     reasonable trier of fact could find other than for the moving party. But on an issue for which the

19     opposing party will have the burden of proof at trial, the moving party need only point out "that

20     there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

21            Once the moving party meets its initial burden, the nonmoving party must go beyond the

22     pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

23     genuine issue for trial." Fed. R. Civ. P. 56(e). The Court is only concerned with disputes over

24     material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

25     *Anderson*, 477 U.S. at 248. It is not the task of the Court to scour the record in search of a

26     genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The

27     nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

28

1  precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the

2  moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

3  II.    Evidence Considered

4        A district court may only consider admissible evidence in ruling on a motion for summary

5  judgment. See Fed. R. Civ. P. 56(e); *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

6        In support of Defendants' motion for summary judgment, a declaration has been filed by

7  Defendants' Attorney Virginia Papan.

8        Plaintiff verified his amended complaint filed on April 5, 2010, by signing it under

9  "penalty of perjury." Plaintiff also verified his opposition and declaration in support of his

10  opposition on September 22, 2010, by signing both under "penalty of perjury." Even with his

11  verified opposition and declaration, the Court can treat Plaintiff's amended complaint as an

12  affidavit in opposition to Defendants' motion for summary judgment under Rule 56 of the

13  Federal Rules of Civil Procedure. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11

14  (9th Cir. 1995).

15  III.   Legal Claims

16        A.    Free Exercise Claim

17        Plaintiff alleged that Defendants violated the First Amendment rights of all AEM

18  Muslims by refusing to grant them separate access to the interfaith chapel to conduct classes

19  according to the AEM, and denying his request to hire a full or part time AEM imam.[4]

20              1.    Legal Standard

21        The First Amendment guarantees the right to the free exercise of religion. *Cruz v. Beto*,

22  405 U.S. 319, 323 (1972). "The free exercise right, however, is necessarily limited by the fact of

23  incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

24  maintain prison security." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). In order to establish a

25  free exercise violation, a prisoner must show a defendant burdened the practice of his religion by

26

27  ─────────────

  [4] As explained above, Plaintiff's First Amendment claims relating to the denial of the Suhoor

28  meals has been DISMISSED without prejudice.

Order Granting Defendants' Motion to Dismiss and Motion for Summary Judgment
G:\PRO-SE\SJ.LHK\CR.09\Rice496msj.wpd                    9

1  preventing him from engaging in conduct mandated by his faith, without any justification

2  reasonably related to legitimate penological interests. *See Freeman v. Arpaio*, 125 F.3d 732, 736

3  (9th Cir. 1997) *overruled in part on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-

4  85 (9th Cir. 2008). To reach the level of a constitutional violation, "the interference with one's

5  practice of religion must be more than an inconvenience; the burden must be substantial and an

6  interference with a tenet or belief that is central to religious doctrine." *Id.* at 737 (internal

7  quotation marks and citation omitted). A prisoner may be inconvenienced in the practice of his

8  or her faith so long as the governmental conduct does not prohibit the prisoner from

9  "participating in the mandates of his religion." *See Freeman*, 125 F.3d at 737.

10  A restriction on an inmate's First Amendment religious rights is valid if it is reasonably

11  related to legitimate penological interests. *See O'Lone*, 482 U.S. at 349 (quoting *Turner v.*

12  *Safley*, 482 U.S. 78, 89 (1987)). The burden is on the prison officials to prove that the restriction

13  of the prisoner's exercise of religion was reasonably related to a legitimate penological objective.

14  *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677-78 (9th Cir. 1997) (applying test from *O'Lone*

15  and *Turner* to determine reasonableness of decision denying Jewish prisoner's request for an all-

16  kosher diet). In making such a determination, the district court should consider four factors:

17  
18  
19  
20  
21
> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one. A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates. A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

22  *Allen v. Toombs*, 827 F.2d 563, 567 (9th Cir. 1987) (citing *Turner*, 482 U.S. at 89-91).

23  2.   Analysis

24  In his amended complaint, Plaintiff alleges that Defendants have "substantially burdened

25  [his] religious practices by denying [him] time and access to interfaith chapel for group worship

26  according to his sincerely held beliefs from the [AEM] train of thought." (Am. Compl. at 10.)

27  Plaintiff also claims that Defendants have "substantially burdened [his] religious practices by not

28  hiring adequate, or a qualified [imam or] Muslim representative from the [AEM] train of

1 | thought[,] [in a] full or part time [position]." (*Id.*)

2 | However, Plaintiff has not put forth admissible evidence sufficient to create a genuine

3 | issue of material fact as to whether having separate access to the interfaith chapel to conduct

4 | classes according to the AEM, rather than simply attending the offered Muslim services at the

5 | interfaith chapel, is mandated by the AEM Muslim faith. *Cf. O'Lone*, 482 U.S. at 345 (citing to

6 | record therein; finding record established prisoners' sincerely held religious beliefs compelled

7 | attendance at Jumah services). In his opposition, Plaintiff makes the conclusory statement that

8 | "the present Islamic program does not accommodate his train of thought." (Opp'n at 10.) He

9 | does not support his statement with any evidence or offer any further explanation.

10 | Nor does Plaintiff put forth admissible evidence sufficient to create a genuine issue of

11 | material fact as to whether requiring Defendants to hire a full or part time AEM imam -- rather

12 | than take advantage of the Muslim Chaplin who provides comprehensive religious programs in

13 | the chapel -- is mandated by the AEM Muslim faith.

14 | Even if there were evidence to support Plaintiff's allegations that Defendants prevented

15 | him from engaging in conduct mandated by his religion, no violation of his First Amendment

16 | rights can be established if the restriction was reasonably related to legitimate penological

17 | objectives. *See O'Lone*, 482 U.S. at 349 (citing *Turner*, 482 U.S. at 89). As mentioned above,

18 | the Supreme Court has identified four factors for district courts to consider when determining

19 | whether a regulation is reasonably related to legitimate penological interests: (1) whether there is

20 | a "valid, rational connection between the prison regulation and the legitimate governmental

21 | interest put forward to justify it"; (2) "whether there are alternative means of exercising the right

22 | that remain open to prison inmates"; (3) "the impact accommodation of the asserted

23 | constitutional right will have on guards and other inmates, and on the allocation of prison

24 | resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the

25 | rule at issue is an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 89-90.

26 | The task in considering the *Turner* factors is not to balance the four factors, but, rather, to

27 | determine whether the state shows a "reasonable" relation between the policy and legitimate

28 | penological objectives, rather than simply a "logical" one. *Beard v. Banks*, 126 S. Ct. 2572, 2580

1   (2006). While all justifiable inferences must be drawn in the prisoner's favor with respect to

2   matters of disputed fact, in disputed matters of professional judgment the court's inferences must

3   accord deference to the views of prison authorities. *See id.* at 2578. Unless a prisoner can point

4   to evidence showing the policy is not reasonably related to legitimate penological objectives,

5   sufficient to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

6   *Id.*

7        An inmate who adheres to a minority religion must be afforded a "reasonable

8   opportunity" to exercise his religious freedom. *See Cruz*, 405 U.S. at 322 & n.2. This does not

9   mean, however, that every religious sect or group within a prison must have identical facilities or

10  personnel. *See id.* The refusal to provide an inmate who adheres to a minority religion with the

11  clergyman of his choice does not constitute a claim under the Free Exercise Clause. *See Ward v.*

12  *Walsh*, 1 F.3d 873, 880 (9th Cir. 1993); *see also Johnson v. Moore*, 948 F.2d 517, 520 (9th Cir.

13  1991); *Reimers v. Oregon*, 863 F.2d 630, 632 (9th Cir. 1988).

14                     a.        First *Turner* Factor

15       Here, with respect to the first *Turner* factor, Defendants assert they were unable to

16  provide Plaintiff with separate access to the interfaith chapel or with an AEM imam because

17  prison regulation is to "provide for the religious and spiritual welfare of all interested inmates."

18  (MTD at 10.) Plaintiff does not dispute the fact that CTF has already hired a Muslim Chaplain,

19  who provides a "comprehensive religious program in the chapel that addresses the essentials for

20  those who profess Islam as their religion and the religious programs of the [AEM] do not

21  significantly differ from the present Islamic religious programs available at the [CTF]." (Reply at

22  9.) However, Plaintiff argues, as mentioned above, that the present Islamic program does not

23  accommodate the AEM train of thought. He also argues that prison regulation "allows volunteer

24  religious leaders to come to CTF-Soledad, after an approval process, and also let[s] inmates

25  conduct services themselves," but that he was denied "this opportunity." (Opp'n at 10.) In

26  response, Defendants have submitted prison regulations to support their allegation that "the

27  legitimate governmental interest is to provide for the religious and spiritual welfare of all

28  interested inmates." (MTD at 10.) Pursuant to these relevant sections from Title 15 of the

California Code of Regulations, the prison regulations at issue provide as follows:

    (1) section 3210(a): "Institution heads shall make every reasonable effort to provide for the religious and spiritual welfare of all interested inmates, . . . . " Cal. Code Regs., tit. 15 § 3210(a).

    (2) section 3210(b): "Depending upon the number of inmates of the various faiths, chaplains may be employed or their services may be accepted on a nonpaid volunteer basis. When feasible, separate space for services of the faith groups represented by a substantial number of inmates shall be provided. However, in some facilities, . . . it shall be necessary for the various faith groups to share such space as is available for religious services." Cal. Code Regs., tit. 15 § 3210(b).

    (3) section 3210(d): "A request for a religious service accommodation that requires a specific time, location and/or item(s) not otherwise authorized, will be referred to a Religious Review Committee (RRC) for review and consideration . . . . Accommodation for religious services that are not granted, shall be for reason(s) which would impact facility/unit safety and security, and orderly day to day operations of the institution." Cal. Code Regs., tit. 15 § 3210(d).

    (4) section 3211: "[W]hen a chaplain of a particular faith cannot be obtained to conduct services . . . the institution head may at their discretion . . . designate a qualified inmate to minister to the religious needs of inmates for that specific faith." Cal. Code Regs., tit. 15 § 3211.

Defendants claim that because they "made reasonable efforts to provide for [Plaintiff's] religious and spiritual welfare, the first *Turner* factor weighs in [their] favor." (MTD at 10.)

    As to his claim of a denial of separate access to the interfaith chapel, the record shows that Plaintiff had access to the Islamic religious programs that were already being offered at the interfaith chapel. In his opposition, Plaintiff also acknowledges that his "claim regarding specific days in the interfaith chapel would require adjusting pre-existing religious programs and [he] admits it is comprehensive." (Opp'n at 10.) Furthermore, Plaintiff's request for separate service time at the interfaith chapel was referred to the RRC for consideration; however, nothing in the record shows the result of that referral. (Am. Compl. at 8, Ex. A-6.) However, because Plaintiff does not allege that his request was denied by the RRC or that any of the Defendants were part of the RRC, then none of said defendants can be held liable for failing to consider his request for separate access to the interfaith chapel. Furthermore, the Court finds that any restrictions in place for use of the interfaith chapel are reasonably related to the legitimate penological interests, i.e., safety of prison officials and prisoners, while at the same time not impinging on Plaintiff's right to free exercise of religion because he could still benefit from the existing Islamic religious

1 | programs. *See Turner*, 482 U.S. at 89.

2 | As to Plaintiff's claim of a denial of his request to hire an AEM imam, the Court first

3 | notes that Defendants' refusal to provide Plaintiff, who as an AEM Muslim adheres to a minority

4 | religion, with the clergyman of his choice does not constitute a claim under the Free Exercise

5 | Clause. *See Ward*, 1 F.3d at 880 (no affirmative duty to provide prisoner with Orthodox rabbi);

6 | *see also Johnson*, 948 F.2d at 520 (no free exercise violation where prisoner did not show

7 | prison's failure to provide him with Unitarian Universalist chaplain denied him "reasonable

8 | opportunity" to exercise his faith); *Reimers*, 863 F.2d at 632 (no violation where prisoner denied

9 | United Pentecostal pastor). Second, even if Plaintiff's request to hire an AEM imam was denied,

10 | prison regulation allows institution heads to designate a "qualified inmate to minister to the

11 | religious needs of inmates for that specific faith." Cal. Code Regs. tit. 15, § 3211. The record

12 | also shows that Defendants did not necessarily deny Plaintiff access to an imam, but rather, their

13 | failure to provide an AEM imam was due to the practical hardships and budgetary concerns with

14 | hiring an AEM imam especially when there was already a Muslim Chaplain on staff. (Am.

15 | Compl., Ex. B-8 at 1.) In fact, the denial at the third level of review dated May 12, 2008, states

16 | that it was "an undue financial burden on the State to provide funding for religious services and a

17 | representative of a given faith for every sect and at each institution throughout the CDCR." (Am.

18 | Compl., Ex. B-8 at 1.) The denial also adds that one of the primary responsibilities of the

19 | Muslim Chaplain is "to address the spiritual and religious educational needs of inmates at the

20 | CTF . . . [and] [t]he Muslim community is able to benefit through the existing religious resources

21 | available at the institution." (*Id.*) Plaintiff claims that he does not question "the veracity and

22 | dignity of the recently hired Muslim chaplain imam Ansaar Aquil," and that the AEM

23 | community "welcome him and uphold him in the highest admiration and [their] thanks is to

24 | Allah (God) for him and sincerely ask Allah to continue to assist [Imam Aquil] in his quest to

25 | uplift humanity as well as Muslim inmates . . . ." (Am. Compl., Ex. B-4 at 1.) In fact, as

26 | explained above, the Muslim Chaplain met with Plaintiff on November 20, 2007, to discuss his

27 | previous group appeal relating to separate access to the interfaith chapel, and Plaintiff admitted

28 | that he was "not in opposition with regard to Imam Tariq Ansaar Aquil's religious program . . . ."

1   (Am. Compl., Ex. A-2 at 2.)  Therefore, nothing in the record shows that Plaintiff could not have

2   benefitted from the services provided by the Muslim Chaplain on staff.  Thus, Defendants'

3   refusal to hire an AEM imam did not deny Plaintiff all means of religious expression.

4        Further, Plaintiff has not presented admissible evidence that calls into question the valid,

5   rational connection between the aforementioned prison regulations relating to religious service

6   accommodations that require a specific time of service or a specific religious leader for each sect,

7   the legitimate security and budgetary concerns faced by prison officials, and the rational

8   relationship between refusing to grant separate access to the chapel for AEM and to hire an AEM

9   imam and addressing those concerns.  *See Anderson v. Angelone*, 123 F.3d 1197, 1198 (9th Cir.

10  1997) (holding ban on inmate-led religious activity reasonably related to legitimate security

11  concerns that inmate activities be supervised and religious groups not subvert prison authority).

12  Accordingly, the Court finds Defendants have satisfied the first element of the *Turner* test.

13                     b.   Second *Turner* Factor

14        As noted, the second *Turner* factor is "whether there are alternative means of exercising

15  the right that remain open to prison inmates."  *Turner*, 482 U.S. at 89-90.  In *O'Lone*, the

16  Supreme Court upheld a prison regulation that precluded prisoners from returning mid-day for

17  Jumah prayer services, where those prisoners were part of a work-gang detailed on assignments

18  outside of the prison.  *See* 482 U.S. at 349.  The Supreme Court found that although there were

19  no alternative means for the prisoners to attend Jumah services, the prisoners nevertheless

20  retained their ability to participate in other Muslim religious ceremonies and practices, and that

21  such ability supported the reasonableness of the restriction.  *Id.* at 352-53.  Here, as explained

22  above, regardless of the fact that prison officials are not required to provide separate access of the

23  interfaith chapel for AEM Muslims or an AEM imam, Plaintiff was given and still possesses a

24  reasonable opportunity to use the interfaith chapel and to benefit from the services provided by

25  the Muslim Chaplain in order to freely participate in the Islamic religious programs.  *See Cruz*,

26  405 U.S. at 322 n.2.

27        Therefore, the Court finds that Defendants have satisfied the second element of the

28  *Turner* test.  Specifically, Plaintiff had "alternative means" of exercising his First Amendment

1    rights, even if he did not have separate access to a chapel or the benefit of an AEM imam,

2    because he had the ability to worship at the chapel with the Muslim Chaplain using the present

3    Islamic program. *Turner*, 482 U.S. at 89-90; *see also Henderson v. Terhune*, 379 F.3d 709, 714

4    (9th Cir. 2004) (relevant inquiry under *Turner's* second factor is not whether the inmate has an

5    alternative means of engaging in a particular religious practice that he or she claims is being

6    affected; rather, it is whether the inmate has been denied all means of religious expression)

7    (internal quotation marks and citations omitted).

8                            c.   Third and Fourth *Turner* Factors

9         With respect to the third *Turner* factor, the evidence before the Court shows Defendants'

10   restriction on separate access to the interfaith chapel and on hiring an AEM imam was reasonable

11   in light of the impact the accommodation of Plaintiff's asserted right to such services would have

12   on the allocation of prison resources generally.  First, Plaintiff admits in his opposition that

13   giving him separate access to the interfaith chapel would require "adjusting pre-existing religious

14   programs" and he admits it is "comprehensive." (Opp'n at 10.) Consequently, prison officials

15   could reasonably conclude that allowing separate access to the interfaith chapel would duplicate

16   the present Islamic religious programs already available.  Secondly, as explained above, prison

17   officials also denied Plaintiff's request to hire an AEM imam due to budgetary concerns.  The

18   CDCR has a compelling, legitimate interest in meeting their budgetary constraints.  *See Cutter v.*

19   *Wilkinson*, 544 U.S. 709, 723 (2005).  Furthermore, as to the fourth *Turner* factor, these

20   difficulties also make clear that there were no "obvious, easy alternatives" to the policies adopted

21   by Defendants. *See O'Lone*, 482 U.S. at 353.  Moreover, Plaintiff fails to suggest any reasonable,

22   cost-effective alternatives to the prison official's policies relating to separate access to the

23   interfaith chapel and hiring of religious leaders for a particular sect.  Accordingly, the Court finds

24   Defendants have satisfied the third and fourth elements of the *Turner* test.

25        In sum, the Court finds that, even viewing the evidence in the light most favorable to

26   Plaintiff, he has failed to establish a "genuine issue for trial" concerning the violation of his First

27   Amendment right to religious freedom based on the aforementioned actions of Defendants that

28   allegedly interfered with Plaintiff's religious practices. *Celotex*, 477 U.S. at 324.  Therefore,

1  Defendants are entitled to summary judgment as a matter of law in regards to this claim.

2         B.    <u>Equal Protection</u>

3              1.    <u>Legal Standard</u>

4        The Equal Protection Clause requires that an inmate who is an adherent of a minority

5  religion be afforded a "reasonable opportunity of pursuing his faith comparable to the

6  opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz*, 405

7  U.S. at 322, as long as the inmate's religious needs are balanced against the reasonable

8  penological goals of the prison, *O'Lone*, 482 U.S. at 349.  The district court must consider

9  whether "the difference between the defendants' treatment of [the inmate] and their treatment of

10  [other] inmates is 'reasonably related to legitimate penological interests.'" *Shakur v. Schriro*, 514

11  F.3d 878, 891 (9th Cir. 2008) (citation omitted) (finding district court erroneously applied

12  rational basis review to plaintiff's claim that defendants violated equal protection clause by

13  providing only Jewish inmates with kosher meat diet and remanding claim so record could be

14  more fully developed regarding defendants' asserted penological interests).

15        An inmate "'must set forth specific facts showing a genuine issue ' as to whether he was

16  afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths"

17  and that "officials intentionally acted in a discriminatory manner." *Freeman v. Arpaio*, 125 F.3d

18  732, 737 (9th Cir. 1997), *abrogated on other grounds by Shakur*, 514 F.3d at 884-85.

19        Although prisoners are entitled to equal protection, it does not follow that a prison must

20  duplicate every religious benefit it provides so that all religions are treated exactly the same.  As

21  the Supreme Court explained in <u>Cruz</u>:

22          We do not suggest . . . that every religious sect or group within a prison --
        however few in number -- must have identical facilities or personnel.  A special

23          chapel or place of worship need not be provided for every faith regardless of size;
        nor must a chaplain, priest, or minister be provided without regard to the extent of

24          the demand.  But reasonable opportunities must be afforded to all prisoners to
        exercise the religious freedom guaranteed by the First and Fourteenth

25          Amendments without fear of penalty.

26  405 U.S. at 322 n.2.  Application of the *Cruz* standard does not require "strict numerical

27  analysis" or "create a system of ratios or quotas." *Thompson v. Commonwealth of Ky.*, 712 F.2d

28  1078, 1081 (6th Cir. 1983); *see also Butler-Bey v. Frey*, 811 F.2d 449, 453 (8th Cir. 1987).  It

1   does require that the prison make a good faith accommodation in light of practical

2   considerations. *See Freeman*, 125 F.3d at 737; *Thompson*, 712 F.2d at 1082 (court should

3   scrutinize the prison officials' conduct to determine whether they deliberately discriminated

4   against the minority religion or abused their discretion in distributing the prisons' limited

5   resources).

6        2.    Analysis

7        The Court finds that Plaintiff has not established a prima facie case of discrimination

8   against his religion based on the denial of his request for separate access to the interfaith chapel

9   and for the hiring of an AEM imam. In fact, Plaintiff has not presented any direct or indirect

10   evidence to support his equal protection claim against Defendants. Rather, he makes a

11   conclusory allegation that Defendants denied him the aforementioned religious accommodations

12   while allegedly treating him differently than the inmates that practice other religions. (Am.

13   Compl. at 11.)

14       While Plaintiff presented a cognizable claim for a violation of equal protection, the

15   aforementioned allegations alone will not survive a motion for summary judgment. Plaintiff's

16   claim is entirely conclusory, and he has come forward with nothing to even suggest that the

17   denial was based on his religion. His conclusory allegations and mere assertions of

18   discrimination against his religion are insufficient to overcome a motion for summary judgment.

19   Fed. R. Civ. P. 56; *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Preston v.*

20   *Heckler*, 734 F.2d 1359, 1373 (9th Cir. 1984); *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir.

21   1983). Specifically, Plaintiff's conclusory claim that Defendants denied AEM Muslims separate

22   access to the interfaith chapel "while allowing orthodox Muslims, Jewish, Christian inmates time

23   in the interfaith chapel to practice their religious practices," (Am. Compl. at 11), is not enough to

24   defeat summary judgment because, as mentioned above, Defendants need not duplicate every

25   religious benefit provided so that all religions are treated exactly the same. *See Thompson*, 712

26   F.2d at 1081 (upholding grant of summary judgment on Muslim inmates' request for access to

27   chapel comparable to Christian inmates). Neither does his conclusory claim that Defendants

28   "hire[] chaplains for other faiths, but not [AEM]'s faith," (Am. Compl. at 11), defeat summary

1  judgment because a chaplain need not be provided for every faith without regard to the extent of

2  the demand. *See Cruz*, 405 U.S. at 322 n.2.

3         Moreover, Defendants presented evidence showing various prison regulations to support

4  their allegation that "the legitimate governmental interest is to provide for the religious and

5  spiritual welfare of all interested inmates." Cal. Code Regs., tit. 15 §§ 3210(a), 3210(b), 3210(d),

6  3211. As stated above, Plaintiff was given access to the Islamic religious programs already being

7  offered at the interfaith chapel, and he could also benefit from the Muslim Chaplain that had

8  already been hired. Plaintiff has not produced any evidence indicating that Defendants harbored

9  a discriminatory intent in denying him separate access to the interfaith chapel or the AEM imam.

10 Accordingly, Plaintiff has set forth no facts showing that there is a genuine issue for trial on his

11 equal protection claim. *See* Fed. R. Civ. P. 56(e). Plaintiff's conclusory assertion that

12 Defendants have violated the Equal Protection Clause is not enough to show that Defendants

13 have denied him a "reasonable opportunity" to pursue his faith comparable to that afforded

14 prisoners of other faiths. *See Cruz*, 405 US at 322. The Court finds that Defendants have shown

15 that no genuine issue of material fact exists by demonstrating that "there is an absence of

16 evidence" to support Plaintiff's claim of an equal protection violation. *Celotex*, 477 U.S. at 325.

17 Therefore, Defendants are entitled to summary judgment on this First Amendment claim.

18     C.    RLUIPA

19           1.    Legal Standard

20         RLUIPA provides that no state may impose a "substantial burden" on a prisoner's exercise

21 of religion unless the action or policy in question provides the least restrictive means of serving a

22 compelling governmental interest. 42 U.S.C. § 2000cc-1(a). In order to state a claim under

23 RLUIPA, the plaintiff bears the burden of coming forward with evidence demonstrating the

24 state's action or policy constituted a substantial burden on his exercise of religion. *Warsoldier v.*

25 *Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). The focus of this initial inquiry necessarily is

26 on the manner in which the plaintiff's religious exercise is impacted, rather than on the

27 reasonableness of the facility's policy or regulation. *Id.* at 995.

28

1     RLUIPA does not define "substantial burden." *See* 42 U.S.C. § 2000cc-5. The Ninth

2  Circuit, however, has held an action or policy constitutes a substantial burden if it constitutes a

3  "significantly great restriction or onus on any exercise of religion, whether or not compelled by,

4  or central to, a system of religious belief of a person, including a religious assembly or

5  institution." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034-35 (9th

6  Cir. 2004) (internal quotations omitted). As further defined by the Ninth Circuit, a substantial

7  burden "must be more than an inconvenience"; it must prevent the plaintiff "from engaging in

8  [religious] conduct or having a religious experience." *Navajo Nation v. United States Forest*

9  *Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2006) (internal quotations and citations omitted) *overruled*

10  *on other grounds by* 535 F.3d 1058 (9th Cir. 2008) (en banc).

11              2.     <u>Analysis</u>

12     Defendants contend the restriction on Plaintiff's ability to have separate access to the

13  interfaith chapel and the refusal to hire an AEM imam do not amount to a substantial burden on

14  Plaintiff's exercise of religion. The record shows that Plaintiff was not coerced by a law to

15  violate his religious beliefs. In fact, he was not prevented from practicing his Muslim faith, he

16  was provided with ample opportunities to meet with the Muslim Chaplain, he was afforded

17  opportunities to freely participate in the Islamic religious programs offered at the interfaith

18  chapel, he was given full access to all necessary accommodations required in the Qur'an to fulfill

19  his religious core obligations, and he was not penalized for attending services or participating in

20  religious programs. In response, Plaintiff argues that by denying him separate access to the

21  interfaith chapel and refusing to hire an AEM imam, Defendants have violated his RLUIPA

22  rights "by favoring religious denominations over [his], as well as by disfavoring [his] religion,"

23  and "by refusing [him] a reasonable opportunity to pursue his faith comparable to the opportunity

24  accorded inmate adherents (Christians, Jews, Orthodox Muslims) of faiths other than [AEM]

25  train of thought of Islam." (Am. Compl. at 12-13.)

26     It is undisputed Plaintiff was restricted from having separate access to the interfaith

27  chapel and denied the benefit of hiring an AEM imam. However, Plaintiff has not shown how

28

1   such actions by Defendants prevented him from engaging in religious conduct. Importantly,

2   Plaintiff was not prevented from participating in the current Islamic religious programs, and he

3   was offered the services of the Muslim Chaplain on staff. Although congregating with other

4   AEM Muslims to perform services (which Plaintiff claims necessitated separate access to the

5   interfaith chapel) and benefitting from the hiring of an AEM imam, might be the preferred way

6   for Plaintiff to practice his faith, Plaintiff has not shown that his inability to do so resulted in a

7   "significantly great" restriction or onus on the exercise of his religion. Despite the restrictions

8   imposed by the prison regulations mentioned above (Cal. Code Regs, tit. 15 §§ 3210(a), 3210(b),

9   3210(d), 3211) relating to having various faith groups share available space for religious services

10  and to hiring additional chaplains of particular faiths, Plaintiff retained his ability to practice his

11  faith while participating in the current Islamic religious programs offered at the interfaith chapel,

12  to benefit from seeking guidance from the Muslim Chaplain, and to engage in other religious

13  educational and counseling activities. For these reasons, the Court finds Plaintiff has not met his

14  burden of coming forward with evidence that Defendants' actions and the aforementioned

15  relevant prison regulations constituted a substantial burden on his exercise of religion. *See, e.g.,*

16  *Mohammad v. Beard*, 2007 WL 1439051, *10 (W.D. Pa. 2007) (finding denial of prayer rug did

17  not constitute substantial burden on Muslim prisoner's religious beliefs where prisoner showed

18  only it was essential he pray on clean area, not that he pray on prayer rug); *Greene v. Solano*

19  *County Jail*, 2006 WL 2067056, *9 (E.D. Cal. 2006) (finding failure to provide group worship

20  services did not substantially burden prisoner's ability to exercise his religion, and effect on

21  prisoner's exercise of religion was "only incidental," where prisoner was not required to act

22  contrary to his religious beliefs, and alternate means remained available to prisoner to exercise

23  his religious beliefs); *cf. Warsoldier*, (finding prison officials substantially burdened prisoner's

24  religious practice by subjecting him to numerous punishments because he refused to cut his hair).

25      In sum, Plaintiff has not established that Defendants' actions and the aforementioned

26  relevant prison regulations, substantially burdened the practice of his religion under RLUIPA.

27  Accordingly, Defendants are entitled to summary judgment on Plaintiff's RLUIPA claim.

28

3.     Claim for Monetary Damages Under RLUIPA

Plaintiff is not entitled to recover monetary damages against Defendants sued in their official capacities under RLUIPA. Unless a state has waived its Eleventh Amendment immunity or Congress has overridden it, a state cannot be sued regardless of the relief sought. *See Sossamon v. Texas*, 131 S. Ct. 1651, 1658 (2011) (quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99 (1984)) (holding that states, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver); *see Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1111-14 (9th Cir. 2010) (California did not waive its Eleventh Amendment immunity against RLUIPA claim for damages under either RLUIPA or the Rehabilitation Act Amendments of 1986); *see generally Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011). Although the Ninth Circuit has not decided whether damages would be available under RLUIPA against Defendants in their individual capacities, *see Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 n.3 (9th Cir. 2011), several other circuits have determined that such damages are not available. *See Rendelman v. Rouse*, 569 F.3d 182, 188-89 (4th Cir. 2009); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007), *abrogated on other grounds by Sossamon*, 131 S. Ct. 1651. Accordingly, Plaintiff's claim for monetary damages under RLUIPA are DISMISSED.

IV.     Qualified Immunity

In the alternative, Defendants contend that they are entitled to qualified immunity because (1) Plaintiff has failed to show that a constitutional right was violated by Defendants, and (2) it would not have been clear to a reasonable official that their conduct was unlawful in the situation confronted.

A.     Legal Standard

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

1   457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity must determine:

2   (1) whether the plaintiff has alleged the deprivation of an actual constitutional right, and

3   (2) whether such right was clearly established such that it would be clear to a reasonable officer

4   that his conduct was unlawful in the situation he confronted.  *See Pearson v. Callahan*, 129 S.

5   Ct. 808, 818 (2009).  The Court may exercise its discretion in deciding which prong to address

6   first, in light of the particular circumstances of each case.  *Id.*

7          B.     Analysis

8          On the facts presented herein, viewed in the light most favorable to Plaintiff, Defendants

9   prevail as a matter of law on their qualified immunity defense because the record establishes no

10  constitutional violation and no violation of his rights under RLUIPA, as explained above.  Even

11  if such violations did occur, however, Defendants could have reasonably believed their conduct

12  was lawful.  Specifically, a reasonable officer in Defendants' positions would not have been put

13  on notice that denying Plaintiff separate access to the interfaith chapel and refusing to hire an

14  AEM imam (pursuant to the aforementioned related prison regulations, including Cal. Code

15  Regs, tit. 15 §§ 3210(a), 3210(b), 3210(d), 3211) was unlawful or amounted to a RLUIPA

16  violation.  *See Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994) (officers are

17  entitled to rely on the assumption that regulations are drafted in compliance with constitutional

18  standards).  As mentioned above, regulations that allow for restrictions to be in place for use of

19  the interfaith chapel are reasonably related to the legitimate penological interests, i.e., safety of

20  prison officials and prisoners.  Meanwhile, the regulations regarding hiring imams are related to

21  valid budgetary concerns faced by prison officials, and because Plaintiff could benefit from the

22  guidance of the Muslim Chaplain, accommodations were in place to provide for his religious and

23  spiritual welfare.  Therefore, Defendants are entitled to qualified immunity.

24         In sum, Defendants have shown that a reasonable officer in their position could not have

25  believed that their conduct was unlawful or amounted to a RLUIPA violation.  They have met

26  their burden of proof.  Plaintiff has not shown that their behavior was unlawful from the

27  perspective of a reasonable prison official in the situations presented above.  Therefore,

28

1   Defendants are entitled to judgment as a matter of law based on qualified immunity.

2       Accordingly, the Court GRANTS Defendants' motion for summary judgment as to

3   Plaintiff's claims against them.

4   V.   Claims Against Unserved Defendants Warren and Allen

5       Summary judgment may be properly entered in favor of unserved defendants where

6   (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have

7   been briefed, and (3) the plaintiff has been provided an opportunity to address the controlling

8   issues. *Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 802-03 (9th Cir.),

9   *cert. denied*, 516 U.S. 864 (1995) (citing, *inter alia*, *Silverton v. Department of the Treasury*, 644

10  F.2d 1341, 1345 (9th Cir.), *cert. denied*, 454 U.S. 895 (1981)).

11      For the reasons stated above as to the served Defendants' motion for summary judgment,

12  a similar result is also appropriate as to the claims against unserved Defendants Warren and

13  Allen, who have not joined the other Defendants in their motion for summary judgment.  It is

14  apparent that the claims against the unserved Defendants are subject to summary adjudication.

15  The allegations against the unserved Defendants in Plaintiff's Amended Complaint are the same

16  as those against the served Defendants.  There is no suggestion in the Amended Complaint, the

17  exhibits attached thereto, or in the briefs and exhibits filed in connection with the present

18  motions, that the analysis differs with respect to the unserved Defendants as opposed to the

19  served Defendants.  Accordingly, Defendants Warren and Allen are entitled to summary

20  judgment as a matter of law as to all claims against them.

21                          **CONCLUSION**

22      1.      Defendants' motion to dismiss (Docket No. 20) is GRANTED, and Plaintiff's First

23  Amendment claim relating to the denial of Suhoor meals is DISMISSED without prejudice to

24  refiling this claim in a new action after exhausting California's prison administrative process.

25      2.      Defendants' motion for summary judgment (Docket No. 20) is GRANTED as to

26  all remaining claims against the served Defendants, and also as to unserved Defendants Warren

27  and Allen.  Judgment shall be entered in favor of all Defendants.

28

1    3.    The Clerk shall terminate all pending motions and close the file.

2    4.    The Clerk shall also send Plaintiff a blank civil rights complaint form and a blank

3    *in forma pauperis* application along with his copy of this Order.  The spaces for the civil case

4    number should be left blank on both forms because the Clerk will assign a new case number once

5    these forms are completed and filed with the Court.  As mentioned above, Plaintiff may use these

6    blank forms to refile his First Amendment claim relating to the denial of Suhoor meals in a new

7    action after he has exhausted all administrative remedies as to that claim.

8    5.    This Order terminates Docket No. 20.

9    IT IS SO ORDERED.

10   DATED: 9/18/12                          *Lucy H. Koh*

11                                           LUCY H. KOH
                                             United States District Judge